Lawrence K. EPPLE, Jr., et al., Respondents,

v.

WESTERN AUTO SUPPLY COMPANY et al., Appellants.

No. 59683.

Supreme Court of Missouri, En Banc.

March 14, 1977.

Dissenting Opinion April 11, 1977.

Rehearing Denied April 11, 1977.

Paul S. Brown, St. Louis, for appellants.

Alan G. Kimbrell, St. Louis, for respondents.

BARDGETT, Judge.

This case involves a suit brought by plaintiffs-respondents to recover damages arising from the death of their parents who were killed in a head-on collision of the parents' car with a truck owned by defendant-appellant, Western Auto Co., and being operated by defendant-appellant Davis. The case was submitted to the jury under the humanitarian negligence doctrine on the failure of Davis to stop, slacken speed, or swerve, and the jury returned a verdict for plaintiffs and awarded $100,000 in damages. The Missouri court of appeals, St. Louis district, en banc, reversed (three judges dissenting) and ordered the trial court to enter judgment for defendants because it found that plaintiffs failed to make a submissible case on any of the theories presented. On application of plaintiffs-respondents, we transferred this case pursuant to Art. V, sec. 10, Mo.Const. Much of the following opinion is taken from the dissenting opinion in the court of appeals of Gunn, J.

The defendants raise four grounds for reversal on this appeal: 1) the trial court erred in denying their motion for directed verdict because the plaintiffs failed to make a submissible case; 2) the court erred in instructing the jury on the plaintiffs' theory of the case because these instructions were not supported by the evidence and did not conform with MAI; 3) the court erred in failing to define the term "negligence" as used in the instructions to the jury; and 4) the court erred in allowing certain questioning by plaintiffs' counsel on voir dire examination of the jury panel.

The defendants assert that the plaintiffs failed to make a submissible case under the humanitarian doctrine. In determining whether a submissible case was made, the evidence is considered in the light most favorable to the plaintiffs, accepting as true all that is not entirely unreasonable or contrary to physical facts or natural laws and giving to plaintiffs the benefit of all favorable inferences that reasonably may be drawn from such evidence. *Vaeth v. Gegg,* 486 S.W.2d 625 (Mo.1972); *Houghton v. Atchison, Topeka & Santa Fe R. Co.,* 446 S.W.2d 406 (Mo. banc 1969); *Joggerst v. O'Toole,* 513 S.W.2d 722 (Mo.App.1974). From a review of the record, we find that the plaintiffs did make a submissible case.

The head-on collision occurred during the mid-afternoon of July 24, 1969, on Route 87 near Eldon, Missouri. In the vicinity of the accident, Route 87 is a narrow, rolling and winding, paved two-lane highway. The width of the pavement varied between 19½ and 20½ feet, and there were no shoulders on either side of the road. There were ditches along both sides of the pavement. The Epple car, a 1969 Ford station wagon, was northbound and the Western Auto truck, a 45-foot-long tractor trailer, was southbound. The impact occurred in a curve—a curve to the right for the Epple car and a curve to the left for the truck. At the approximate apex of the curve, a gravel road fed into the southbound lane at an angle, forming a "Y" intersection. The two vehicles came together with tremendous force in the southbound lane. The front right portion of the Epple station wagon came in contact with the right front tire of the tractor trailer. At the moment of impact, the left front tire of the Epple car had entered onto the gravel road which was in the line of travel of the Epple car. The station wagon came to rest facing southwardly, having been turned around and pushed some 27 feet south of the point of impact. The truck came to rest on its side in a ditch on the east side of the road after having jackknifed. Five of the seven occupants of the Epple car, including plaintiffs' parents were killed, and Davis suffered a fractured skull.

At trial, the factual circumstances involved in this accident were elicited primarily from defendant Davis who was the sole surviving eyewitness. Due to the head injuries he suffered, however Davis's memory was somewhat unclear as to what actually transpired and therefore some areas of his in-court testimony were inconsistent

with previous statements he had made. These previous statements were introduced into evidence by the plaintiffs as admissions of a party opponent. In determining whether a submissible case was made, the court need look only to those aspects of Davis's account of the accident that were most favorable to the plaintiffs and which the jury could have found to be true. *Wells v. Goforth*, 443 S.W.2d 155 (Mo. banc 1969); *Young v. Kansas City Southern Railroad Co.*, 374 S.W.2d 150, 153 (Mo.1964).

Davis testified that as he approached the curve in Route 87, he was traveling at 40 m. p. h. He first saw the station wagon as it crested a hill at the opposite end of the curve. Although he could not recall how far away the car was, he estimated that it was 200 feet from the point of impact. A plat of this section of Route 87 that was introduced into evidence shows that the crest of the hill is between 250 and 350 feet from the point of impact. When he saw the Epple car crest the hill, Davis noticed that it was at least partly in the wrong lane. Sensing that something was wrong, Davis believed that he applied his brakes as a "reflex" action and began to slow down to a speed of 20–30 m. p. h. He stated that he could see the car at all times after it had crested the hill and that it traveled in a straight line, angling more and more into the southbound lane until the collision occurred. The car did not diminish its speed as it approached the point of impact. As to his own actions, Davis testified that after slowing down to between 20 and 30 m. p. h., he began to down-shift to prevent his engine from dying. He claimed that the purpose of the shift was to have more control over the truck in case he had to quickly maneuver it to avoid an accident. But, under the evidence, the jury could have found the down-shifting could have been for the purpose of gaining power to go negotiate the hill in disregard of the oncoming Epples. Davis also stated that he could not shift and brake at the same time and thus took his foot off the brake when beginning the shift. The accident occurred before the shift could be completed. The right front wheel of the tractor trailer came

in contact with the right front of the Ford station wagon. When the vehicles collided, the left front wheel of the station wagon had entered the gravel road. Davis testified that he was familiar with this section of Route 87, having driven it at least once a week for the last one and one-half to two years. He knew of the existence of the gravel road and, at the time of the accident, was aware of the fact that it might serve as an escape route for the Epple car.

Testimony was also produced from Officer Temmens of the Missouri Highway Patrol who came to the scene thirty-five minutes after the accident. He found and measured skid marks. He stated that there were skid marks 100 feet long leading back to the south from the point of impact. The skid marks began with the left tire about one foot over the center line and led straight to the point of impact. At the point of impact the skid marks made by the right tire were about four feet over the center line. The officer also testified that he found skid marks made by a dual-wheeled vehicle leading to the point of collision from the north. These marks were 78 feet in length and stopped short of the debris. The marks were in the southbound lane and they turned towards the center line as they came to an end. Photographs of all the skid marks were introduced into evidence.

The plaintiffs also produced as a witness a line foreman for Missouri Utilities who was driving a dual-wheeled truck southbound on Route 87 some distance behind the dual-wheeled truck driven by Davis. The witness testified that as he approached the curve in question he saw that the road was blocked due to the accident and was forced to apply his brakes strongly to prevent colliding with the vehicles obstructing the road. He did not know whether he laid down any skid marks.

Also called as a witness was Reverend Ryan who testified that he was driving northbound on Route 87 behind the Epple station wagon for some two to three miles up to the point of the accident. He stated

that the Epple car was traveling between 50–55 m. p. h.

In a humanitarian case, as well as in other actions, the burden is on the plaintiff to establish every essential element of his theory of submission by substantial evidence of probative value or by inferences reasonably deducible therefrom. *Yarrington v. Lininger*, 327 S.W.2d 104, 109 (Mo. 1959); *Martin v. Sherrell*, 418 S.W.2d 209, 214 (Mo.App.1967). The plaintiff must remove his case from the realm of speculation, conjecture or surmise. *Yarrington v. Lininger, supra; Burks v. Wilson*, 356 S.W.2d 121, 128 (Mo.App.1962); *Farmer v. Taylor*, 301 S.W.2d 429, 433 (Mo.App.1957). Under a humanitarian submission, the plaintiff must establish the following five elements: 1) the plaintiff was in a position of immediate danger; 2) the defendant was aware or should have been aware of the plaintiff's position of peril; 3) after receiving such notice, the defendant had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others; 4) the defendant failed to exercise the requisite care to avert such impending injury; and 5) by reason thereof, the plaintiff was injured. *Banks v. Morris & Co.*, 302 Mo. 254, 257 S.W. 482 (banc 1924).

The first step in establishing liability under the humanitarian doctrine is demonstrating that the plaintiff came into a position of immediate danger. This position is commonly defined by the Missouri courts as that position of danger to the plaintiff, whether or not the plaintiff was negligent in getting there, in which by reason of the then existing circumstances, if unchanged, injury to the plaintiff is reasonably certain and not a mere possibility. The peril must actually be imminent and may not be merely remote, uncertain or contingent. *Clifton v. Crider*, 486 S.W.2d 274, 277 (Mo. banc 1972); *Yarrington v. Lininger, supra*, at 109. A bare possibility of injury is not sufficient to create a position of immediate danger. *McClanahan v. St. Louis Public Service Co.*, 363 Mo. 500, 251 S.W.2d 704, 707 (banc 1952).

A determination of when a plaintiff has entered a position of immediate danger must be made in light of the facts and circumstances of each particular case. *Todd v. Presley*, 413 S.W.2d 173, 176 (Mo. 1967); *Hood v. Heppler*, 503 S.W.2d 452, 457 (Mo.App.1973). The question of when and where a plaintiff comes into a position of immediate danger is a jury question. *Yarrington v. Lininger, supra*, at 109; *Nelson v. O'Leary*, 291 S.W.2d 142, 148 (Mo.1956); *Welch v. McNeely*, 269 S.W.2d 871, 876 (Mo. 1954). However, there must be substantial evidence from which the jury can make this determination. *Clifton v. Crider, supra*, at 278; *Burks v. Wilson, supra*, at 128.

In light of the facts and circumstances of this case, could the jury have determined at what point the station wagon entered into a position of immediate danger without resorting to speculation or conjecture? The plaintiffs assert that their parents first came into a position of immediate danger when they were first seen by Davis cresting the hill in the wrong lane. But that was not the point of immediate danger. Simply because the Epple car was in the wrong lane at this point does not place the occupants in a position of immediate danger, for Davis had the right to assume, absent some indication to the contrary, that the approaching vehicle would obey the rules of the road and return to its own side of the road. *Nolte v. Childress*, 387 S.W.2d 569, 573 (Mo.1965); *Nelms v. Bright*, 299 S.W.2d 483, 489–490 (Mo. banc 1957); *State ex rel. State Highway Commission v. Daigh*, 464 S.W.2d 524, 526 (Mo.App.1971). At the time the station wagon crested the hill there was nothing in the reasonable appearances of the circumstances from which Davis could have or should have believed that it would not return to its proper lane. Absent any reason to believe that the Epple car would not return to its lane, a consideration of the location and speeds of the respective vehicles indicates that at the time the station wagon crested the hill the danger of collision was not immediate, impending or certain. The car was between 250 and 350 feet from the point of impact

as it came over the hill and was traveling at a speed of 50–55 m. p. h., or approximately 73–80 feet per second. Thus, as it crested the hill, it would take between three to five seconds for it to reach the point of impact. Davis was traveling at a speed of 40 m. p. h., or approximately 60 feet per second, when he first saw the station wagon. Thus, he was between 180 and 300 feet from the scene of the accident at that time. The total distance separating the two vehicles when Davis first saw the Epple car was between 430 and 650 feet. Under the time span and the distances involved, the danger of collision was not certain or immediate when the station wagon crested the hill, for there was ample time and space for the Epple car to return to its lane. *Nolte v. Childress, supra.* Thus, the plaintiffs' parents were not in a position of immediate danger when they first came into view.

Although the plaintiffs' parents were not in a position of immediate danger when first seen by the defendant, it is apparent that the Epples did enter into such a position when under the circumstances it would reasonably appear that the station wagon was not going to alter its angular movement across the center line and into the path of the oncoming tractor trailer. From the evidence the plaintiffs presented, specifically that dealing with the speed and movement of the station wagon, it was reasonably inferable that Dr. Epple, the driver of the car, realizing his position of peril, determine that his only route to safety was to cross over the southbound lane and escape onto the gravel road. Thus, at a minimum, the plaintiffs' parents came into a position of immediate danger when the path of their vehicle became physically transfixed in the direct path of the oncoming tractor trailer as they were bee-lining towards their only avenue of escape—the gravel road. The jury could have concluded that this fixed movement commenced when the station wagon's course began to angle over the center line with an increasing portion of the vehicle entering the southbound lane. From the evidence adduced at trial, specifically the skid mark path left by the car, this occurred at least 100 feet from the

point of impact. The conclusion here reached as to when the Epples entered into a position of immediate danger is buttressed by a consideration of the physical characteristics of Route 87 at the scene of the accident. The road is extremely narrow, at some points it is 19½ feet wide while at other points it is 20½ feet wide. The road had no shoulders and, in fact, the land on both sides of the road was ditched. Route 87 curved at the scene of the accident and photographs of the highway introduced in evidence indicate that the curve was not banked. It should also be noted that Davis testified that his truck was between 7 and 8 feet wide. Thus, assuming Davis was driving in the center of the southbound lane, his truck would be approximately 12 inches from the center line. From the above facts it can easily be inferred that it would be extremely difficult and hazardous to maneuver a car or change its direction, especially at high speeds. Thus, in light of these circumstances, it would reasonably appear that once the station wagon commenced its fixed course across the southbound lane it would not be able to successfully alter its course to avoid the impending disaster without remedial actions by Davis in the time and space remaining.

■■■ Having determined that the Epple station wagon entered into a position of immediate danger at least 100 feet from the point of the collision, reference is now made to the second element of a humanitarian cause of action: that the defendant knew or should have been aware of the plaintiffs' position of peril. "Whether and when one becomes chargeable with notice that another is in a position of imminent peril depends upon the *reasonable appearances* of the situation confronting him." *Lane v. Wilson,* 390 S.W.2d 943, 947 (Mo.App.1965). The record reveals that the plaintiffs have satisfied this requirement. It should first be noted that when Davis first saw the car crest the hill in the wrong lane he sensed that something might be wrong and therefore applied his brakes as a reflex action. Thus, from first seeing the car, Davis was aware that a perilous situation might be

developing. Davis testified that he could see the car at all times after it crested the hill and was aware as the two vehicles came closer together that the car was traveling in a straight line, angling more and more into his lane. Davis further testified that he knew of the existence of the gravel road and in fact viewed it as a possible escape route for the oncoming station wagon. Thus, from the reasonable appearances of the situation confronting Davis, the jury could have found that he was or should have been on notice of the transfixed movement of the car across his path towards the gravel road—that the Epple car was in a position of immediate danger.

Next, a determination must be made whether the plaintiff produced sufficient evidence to show that once the defendant was placed on notice that the station wagon was in a position of immediate danger, he had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others. Since the plaintiffs submitted their case under three theories of humanitarian negligence, the question can better be stated as follows: Once the station wagon entered into a position of immediate danger, could Davis have averted the collision without injury to himself or others by slackening his speed, stopping or swerving?

■■■ If plaintiffs made a submissible case on any one of the theories submitted, then defendant is not entitled to an outright reversal. We now consider the submission of failure to slacken speed. This submission has been used in a number of instances which have become known as "almost escaping" cases. The essence of an "almost escaping" case is the fact that a plaintiff needed only a fraction of a second to emerge from the position of immediate danger, *Burns v. Maxwell,* 418 S.W.2d 138 (Mo.1967), and if the defendant had taken the slightest action to avoid the collision then no injury would have occurred. *Keithley v. St. Louis Public Service Co.,* 379 S.W.2d 149, 152 (Mo.App.1964); *Woods v. Kurn,* 183 S.W.2d 852 (Mo.App.1944). In establishing an "almost escaping" case the

plaintiff must produce evidence, direct or circumstantial, that in the time and space available, the defendant's speed or movement could have been sufficiently altered to enable the plaintiff's escape. *Schmittzehe v. City of Cape Girardeau,* 327 S.W.2d 918, 924 (Mo.1959); *Stith v. St. Louis Public Service Co.,* 363 Mo. 442, 251 S.W.2d 693, 698 (1952).

■■ This court in a number of cases has recognized that a plaintiff may make a submissible case under the humanitarian doctrine where there has been presented an "almost escaping" situation. In *Schmittzehe v. City of Cape Girardeau, supra,* a collision occurred when the plaintiff's car entered an intersection passing directly in front of the defendant's car which was entering the intersection from a cross street. The right front of defendant's vehicle struck the right rear wheel of plaintiff's car. Under these circumstances the court held the plaintiff made a submissible case because the jury could have found that a slight slackening of speed or swerve by the defendant would have prevented the accident. The court termed this an "almost escaping" case. See also *Burns v. Maxwell, supra; Quigley v. Sneed,* 367 S.W.2d 637 (Mo.1963), and *Stith v. Public Service Co., supra.* In many cases, the plaintiff can meet his burden by letting the facts speak for themselves. "[I]t is . . . recognized that there are many situations where the facts speak for themselves without the aid of expert evidence, as where the evidence shows that the plaintiff's vehicle had but barely failed to get in the clear before the occurrence of the collision, so that only the least additional time would have enabled the plaintiff to make his escape." *Woods v. Kurn, supra,* at 856.

■■ When viewed in the light most favorable to the plaintiffs, their evidence shows that the station wagon needed a mere fraction of a second to completely get onto the gravel road and out of the defendant's path. The right front tire of the tractor trailer came in contact with the right front portion of the station wagon. When the two vehicles collided, the left

front tire of the station wagon had already entered the gravel road. Furthermore, the plaintiffs introduced into evidence as admissions of a party opponent, previous testimony of Davis in which he admitted that he was aware that the gravel road was an avenue of escape for the station wagon. He also stated that as he watched the station wagon approach he believed that there was ample space for the car to actually clear his path and escape onto the gravel road. Although Davis was incorrect in believing the Epple car had ample space to escape, his statements give rise to the inference that the Epples almost escaped the collision.

This inference is buttressed by the following evidence. Under Reverend Ryan's testimony the jury could find the Epple car was traveling 50–55 m. p. h. when it crested the hill. Davis testified he saw the Epple car as it crested the hill and that it did not diminish speed as it approached the collision point. At 50–55 m. p. h., a car travels 73 to 80 feet per second. The evidence as to the positions of the vehicles at impact would support a jury finding that the Epples needed only a car length, or between 15 to 20 feet forward along its line of travel to clear the path of the truck. To cover this distance at the speed they were traveling, the Epples needed approximately one-fourth second. There was ample evidence from which the jury could conclude that Davis was not applying his brakes. Davis himself testified that after his initial "reflex" action of braking when he first saw the Epple car, he took his foot off the brake and attempted to down-shift. He stated that he could not shift and brake at the same time. The lineman for Missouri Utilities, who was driving a dual-wheeled truck behind Davis, testified that as he came upon the scene of the accident he was forced to make a quick and sudden stop. Although he did not know whether he had laid down skid marks, the jury could have inferred that the skid marks were made by this sudden stopping. This conclusion is buttressed by the testimony of Officer Temmens who stated that the skid marks stopped short of the debris. Thus, consistent with its verdict, the jury could have found that by applying his brakes, rather than attempting to down-shift, and thereby slacken his speed the slightest bit, Davis could have avoided the accident and the station wagon would have passed safely onto the gravel road. Consistent with this, the jury could have and did in fact find that the defendant was negligent in failing to slacken his speed to allow the Epples the one-fourth second they needed to emerge from this position of immediate danger, and that this negligence caused the deaths of the plaintiffs' parents.

For the above reasons, the court holds that the plaintiffs made a submissible case under the humanitarian doctrine for failure to slacken speed.

Because we have found the plaintiffs made a submissible case under this theory and because this case must be remanded for a new trial on another issue, it is unnecessary to determine whether plaintiffs made submissible cases on their other theories. The court of appeals found, and we agree that on the record as it stands, plaintiffs failed to make a submissible case under the humanitarian doctrine on failure to stop or swerve. We will not detail the evidence again or further expound on that determination here because the cause must be reversed and remanded anyway for error in plaintiffs' verdict-directing instructions 2 and 3 as set forth infra.

■■■ The defendants assert that the trial court also erred in giving the plaintiffs' verdict-directing instructions (instructions 2 and 3) in that they materially deviated from MAI 17.15. Since both instructions are virtually identical, only instruction 2 is set forth:

"Your verdict must be for plaintiffs whether or not Dr. Lawrence K. Epple was negligent if you believe:

"First, plaintiffs were the surviving minor children of Dr. Lawrence K. Epple, deceased, and

"Second, Dr. Lawrence K. Epple was in a position of immediate danger of being injured and was injured, and

"Third, defendant, James Harvey Davis, knew or by using the highest degree of care could have known of such position of immediate danger, and

"Fourth, at the moment when defendant first knew or could have known of such position of immediate danger, defendant still had enough time so that by using the means available to him and with reasonable safety to himself and all others and by using the highest degree of care, he could have avoided injury to Dr. Lawrence K. Epple by stopping, or slackening his speed, or swerving, and

"Fifth, defendant failed to so stop, slacken his speed or swerve, and

"Sixth, as a direct result of such negligence, Dr. Lawrence K. Epple died."

Defendants contend that this instruction materially deviates from MAI 17.15 in that it omits the word "negligently" from the fifth paragraph. Accordingly, the fifth paragraph should have read: "defendant negligently failed to so stop, slacken his speed or swerve . . . ."

Our research has not revealed any case dealing specifically with the omission of the word "negligently" from MAI 17.15. We are, therefore, guided by the general rules relating to deviations from MAI. In *Murphy v. Land*, 420 S.W.2d 505, 507 (Mo.1967), we stated: "All deviations from the straight and narrow path prescribed in MAI will be presumed prejudicially erroneous unless it is made perfectly clear that no prejudice has resulted. The requirements of MAI are mandatory. The burden of establishing nonprejudice is on the proponent of the instruction." It should be recognized though that it is still the duty of the courts to determine the prejudicial effect of erroneous instructions.

In the instant case the plaintiffs have failed to make a clear showing that no prejudice resulted from the omission of the word "negligently". Furthermore, we are of the opinion that its absence gave the jury the opportunity to find for the plaintiffs if they found defendant Davis merely failed to stop, slacken his speed or swerve, rather than finding he negligently failed to

do the above acts. Because this omission was prejudicial, this case must be reversed and remanded for a new trial.

Next the defendant claims the court erred in failing to define the term "negligence" as used in the instructions to the jury. ·We express no opinion as to whether this constituted prejudicial error. It should be noted, however, that the better practice is to include such a definition where the term negligence appears in any of the instructions. *Carter v. Consolidated Cabs, Inc.*, 490 S.W.2d 39 (Mo.1973).

The case is reversed and will be remanded for retrial. However, before actually remanding the case to the circuit court, we have determined that it is appropriate in this case to consider whether, as has been suggested from time to time, Missouri should adopt some form of comparative negligence. See concurring opinion of Donnelly, J., in *Anderson v. Cahill*, 528 S.W.2d 742, 749 (Mo. banc 1975). Hence, we are docketing the case for further briefing and argument on comparative negligence only at the September 1977 Session. Meanwhile, counsel shall have the right to file motions for rehearing with respect to this opinion according to the standard timetable following the filing of this opinion. Subject to the possibility of a change resulting from action on any motion for rehearing, the court will hear arguments in September on whether, on remand, some form of comparative negligence submission should be utilized. A supplemental opinion will be issued.

SEILER, C. J., FINCH and DONNELLY, JJ., and DIXON and TURNAGE, Special Judges, concur.

MORGAN and RENDLEN, JJ., not sitting.

HENLEY, Judge (dissenting).

I am inclined to agree that plaintiffs did not make a submissible humanitarian case on failure to stop or failure to swerve, but cannot agree that plaintiffs made a submissible case on failure to slacken speed.

The evidence is that the right *front* portion of the braking-slowing station wagon and the right *front* tire of the tractor came into collision when only the left front tire portion of the station wagon was out of the tractor's lane of the highway. There is no evidence of the speed of the station wagon at any point on the highway within the 100 feet of the point of collision. We know that it was less, and became progressively less, than 50–55 miles per hour, because that was its speed before it started laying down 100 feet of tire marks. Nor is there any evidence of the speed of the tractor at any given point of distance from the point of collision during the period of time it took the station wagon to travel this 100 feet. In these circumstances a conclusion that any slackening of the tractor's speed would have permitted the station wagon to escape would be the result of speculation and conjecture. These facts do not, in my opinion, present an "almost escaping" case.

For these reasons, I withdraw my concurrence and respectfully dissent.